UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

KENNETH JAMES-GEORGE HEINISCH,

     Debtor.

_____/

Case No. BT 17-03405
Chapter 7

MICHIGAN UNEMPLOYMENT
  INSURANCE AGENCY,

     Plaintiff,

-vs-

KENNETH JAMES-GEORGE HEINISCH,

     Defendant.

_____/

Adversary Proceeding
No. 17-80170

**OPINION REGARDING NONDISCHARGEABILITY OF DEBT**

Appearances:

Rebecca M. Smith, Lansing, Michigan, attorney for Plaintiff.

Paul I. Bare, Traverse City, Michigan, attorney for Defendant.

I.       INTRODUCTION AND JURISDICTION.

In this adversary proceeding, the Michigan Unemployment Insurance Agency (referred to herein as the "UIA," the "Agency," or the "Plaintiff") alleges that Kenneth James-George Heinisch (the "Debtor" or "Defendant") failed to disclose material facts about being fired from prior employment and that this failure caused the Defendant to receive unemployment benefits that he was not entitled to receive. The Agency argues that the resulting debt for $21,697.00 in unemployment benefit overpayments, $86,788.00

in statutory penalties,[1] and $8,931.91 in interest (less $4,410.99 already collected from the Defendant) is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code[2] and the United States Supreme Court's opinion in *Cohen v. de la Cruz*, 523 U.S. 213, 118 S. Ct. 1212 (1998).[3]

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); L. Civ. R. 83.2(a) (W.D. Mich.).  This nondischargeable debt action is a statutory core proceeding and this court has constitutional authority to enter a final order.   28  U.S.C.  § 157(b)(2)(I)  (determinations  as  to  the  dischargeability  of  certain debts); Parties' Discovery Plan, AP Dkt. No. 7, at ¶ 3(f)(2) (indicating both parties' consent to this court entering a final order.)

## II.    FACTS.

A trial was held in this adversary proceeding on September 5, 2018.  At trial, the court  heard  testimony  from  two  witnesses:  the  Debtor  and  Gretchen  Frost,  an

---

[1]    In 2013, when the Debtor's redetermination was issued, the Michigan Employment Security Act, Mich. Comp. Laws. § 421.1 *et seq.* (the "MES Act"), provided that the Agency could recover damages "equal to 4 times" the overpaid amount from claimants who obtained more than $500 in benefits by knowingly making a false statement or knowingly and willfully failing to disclose a material fact.  Mich. Comp. Laws § 421.54(b)(ii) (2011-2013).  This section of the MES Act was amended effective July 1, 2018, and now provides that the Agency may only recover damages equal to the amount obtained for a first offense or "equal to 1.5 times the amount obtained" for a "second or subsequent violation."  *See* Mich. Pub. Act 226 (2017) (codified as Mich. Comp. Laws § 421.54(b)(i) (2018)).

[2]    The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

[3]    The Agency's trial brief also argues that the penalties are nondischargeable under § 523(a)(7).  This allegation was not set forth in the UIA's adversary complaint, was not identified as an issue by the parties or the court in the pretrial orders, and was not otherwise raised by either party outside of the Agency's briefing.  Because the issue is not properly before the court, the court will not address the potential nondischargeability of the penalties under § 523(a)(7) in this opinion.

unemployment insurance examiner for the Agency.  Both witnesses testified credibly.  Prior to the trial, the parties submitted a Stipulation of Facts for Trial, with five exhibits attached.  (AP Dkt. No. 30.)  The court also admitted Plaintiff's Exhibits 1 through 16 by stipulation at trial.  After the conclusion of the trial, the Plaintiff submitted an Affidavit of Gretchen Frost which included supplemental testimony and two additional exhibits.  (AP Dkt. No. 36.)  On October 15, 2018, the court held a post-trial status conference, at which counsel for the Debtor stipulated to the admission of the affidavit and attached exhibits.  The court subsequently entered an order admitting the Frost affidavit into evidence as Plaintiff's Exhibit 17 and the attached exhibits as Plaintiff's Exhibits 18 and 19.  (AP Dkt. No. 41.)   A Second Affidavit of Gretchen Frost with Supplemental Testimony Following Trial (AP Dkt. No. 40) was also admitted into evidence as Plaintiff's Exhibit 20 in accordance with the court's order and without objection from the Debtor.  The following findings of fact are based on this trial record.

A.  _The Debtor's Employment and Termination from Harris IT Services_.

The Debtor was hired by Harris IT Services as a field technician in August 2011.  (Stip. Facts at ¶ 1.)  Throughout the Debtor's employment, Harris IT had policies in effect which provided that employees were not permitted to have drug or alcohol-related convictions on their driving record and required employees to disclose any driving offenses to Harris IT.  (Stip. Facts at ¶ 2.)

In September 2011, the Debtor was convicted of operating a motor vehicle while impaired by liquor and his driver's license was restricted by the State of Michigan.  (Stip. Facts at ¶ 4-6.)  The Debtor did not disclose the conviction or the restrictions on his driver's license to Harris IT.  (Stip. Facts at ¶ 7.)  In early 2012, Harris IT ran a search of

the Debtor's driving record and discovered the conviction.  (Stip. Facts at ¶ 8.)  Harris IT terminated the Debtor's employment for failing to comply with the company's alcohol and vehicle policies on February 7, 2012. (Stip. Facts at ¶ 9-10.)

B.  *The Initial Application for Benefits and Eligibility Determination*.

Soon after being fired from his job with Harris IT, the Debtor applied for unemployment benefits through the Agency.  When initially applying for unemployment benefits, applicants like the Debtor are required to make various representations regarding their eligibility.  One such requirement is that the claimant must indicate the reason they separated from their previous employer.  (Plf. Exh. 1, at 5-6.)  Claimants may be disqualified from receiving benefits if they do not meet the Agency's eligibility criteria, including if they have previously been fired for misconduct associated with their work.[4] (Plf. Exh. 1, at 6.)

The Debtor testified that he had no recollection of completing the initial application for unemployment benefits and could not recall if he filled it out online or in person.  (Tr. at 49.)  Agency records, however, establish that his initial application was completed online.  (Plf. Exh. 2; Tr. at 18-19.)  The application, which was filed on February 21, 2012, lists "laid off" as the reason for the Debtor's separation from his prior employer.  (Plf. Exh. 2.)  The Debtor offered no explanation for why he gave "laid off" as his separation reason.

---

[4]    Section 29(1)(b) of the MES Act provides that "an individual is disqualified from receiving benefits if he or she . . . [w]as suspended or discharged for misconduct connected with the individual's work . . . ."  Mich. Comp. Laws § 421.29(1)(b).  The term "misconduct" is not defined in the statute.  The Michigan Supreme Court has held that "misconduct" requires something more than "mere inefficiency, unsatisfactory conduct, [or] failure in good performance . . ." and instead occurs when the employee acts in "willful disregard of the employer's interests" or in "deliberate violation of standards of behavior which an employer has a right to expect of his employee." *Carter v. Michigan Employment Sec. Comm'n*, 111 N.W.2d 817, 819 (Mich. 1961) (citations omitted).

4

He stated that he generally remembered the application being long, but not especially confusing.  (Tr. at 51.)  He explained that he believed that he was entitled to unemployment benefits because "as far as [he] knew, unless you quit a job . . . you're eligible for unemployment."  (Tr. at 49.)  Based on the information in his application, the Debtor was approved for unemployment benefits.  (Tr. at 20.)

After being approved for benefits, claimants like the Debtor receive a Monetary Determination from the Agency which includes important information about their claim, such as the weekly benefit amount.  The Monetary Determination received by the Debtor is dated February 24, 2012, and states that his weekly benefit amount is $362.00.[5]  (Plf. Exh. 3.)  The issuance of the Monetary Determination put the Debtor's claim into "pay status." (Plf. Exh. 17 at ¶ 16.)  According to the Frost affidavit, Agency policy and binding case law[6] mandate that once a claim is put into pay status, "the Agency 'must promptly begin paying the benefits and may not terminate the payments merely on the basis of an employer protest.'" (Plf. Exh. 17 at ¶ 14, quoting Plf. Exh. 19.)  In addition, "once benefit payments begin, they may be terminated only 'after a redetermination has been issued finding the claimant disqualified or ineligible for benefits.'" (Plf. Exh. 17 at ¶ 15, quoting Plf. Exh. 19.)

Consistent with his initial application, the reason for the Debtor's separation from Harris IT is listed on the Monetary Determination as "lack of work." (Plf. Exh. 3.)  Gretchen

---

[5]    The Monetary Determination entered into evidence at trial as Plaintiff's Exhibit 3 is the copy that was provided to Harris IT.  Ms. Frost testified that a similar document would have been sent to the Debtor.  (Tr. at 21.)

[6]    The case law on which the Agency relies is the United States Supreme Court's decision in *California Dept. of Human Resources Dev. v. Java*, 402 U.S. 121, 91 S. Ct. 1347 (1971).

Frost testified that this information would have come directly from the Debtor's application.[7]  (Tr. at 21.)  She further explained that upon receiving a monetary determination from the Agency, applicants are required to correct any information on the determination that they know to be inaccurate.  (Tr. at 22.)  She stated that an applicant may accomplish this by exercising the protest rights outlined in the determination.  (Tr. at 23.)  These protest rights are also set forth in the handbook provided to all claimants, entitled "Unemployment Benefits in Michigan:  A Handbook for Unemployed Workers" (herein, the "Handbook").  (Plf. Exh. 1.)  The Handbook states that each claimant should review his or her monetary determination carefully to ensure that the information, including the separation reason, is correct.  (Plf. Exh. 1, at 6.)  It defines the Last Employer Separation Reason as the reason the claimant "gave for leaving [his or her] last employer" and informs the claimant that if he or she was "not laid off for lack of work" the Agency will issue a "separate decision" determining whether the claimant "can receive unemployment benefits."  (Plf. Exh. 1, at 5.)  Ms. Frost testified that Agency records showed that a hard copy of the Handbook was mailed to the Debtor.  (Tr. at 16.)  The Debtor acknowledged that he likely received a copy of the Handbook but testified that he "probably didn't even read it."  (Tr. at 51-52.)

The Debtor did not protest his Monetary Determination, despite the fact that the separation reason it listed was inaccurate.  (Tr. at 24.)  Gretchen Frost testified that if the Debtor had protested the determination and corrected the determination to reflect that he

---

[7]    It appears that the Agency uses the terms "laid off" and "lack of work" somewhat interchangeably.  When asked what the Debtor's Monetary Determination said about the Debtor's departure from Harris IT, Ms. Frost answered, "It said that there was a lack of work or laid off." (Tr. at 21.)  She distinguished these terms from "firing" or "suspension or disciplinary layoff" which she testified are listed "separately from lack of work" among the potential separation reasons on the initial application.  (Tr. at 41.)

was fired from his employment with Harris IT, "his benefits would have stopped" and the Agency would have commenced an investigation into his eligibility.  (Tr. at 24.)  As a practical matter, because the Monetary Determination was in the Debtor's favor, he had little incentive to file a protest and point out that the separation reason was inaccurate.

C.  *The Debtor's Bi-Weekly MARVIN Certifications.*

After initially being approved for benefits, the Debtor was required to certify his eligibility to actually receive the benefits by calling or logging in to the Michigan Automated Response Voice Interactive Network ("MARVIN").  The MARVIN system asks claimants a series of questions to establish the claimant's eligibility to receive benefits for the prior two-week period.  The relevant question in this adversary proceeding is Question #5, which asks:

> *QUESTION #5:  DID YOU QUIT ANY WORK, FAIL TO ACCEPT ANY JOB OFFER, OR GET FIRED FROM A JOB?*

> Did this occur during the 2 weeks you are claiming?

(Plf. Exh. 1, at 15.)

Plaintiff's Exhibit 4 shows that the Debtor certified for benefits through MARVIN numerous times beginning in March 2012 and continuing through May 2013.  The exhibit establishes that the Debtor answered "no" to Question #5 every time he certified for benefits.  (Plf. Exh. 4.)  Gretchen Frost acknowledged, in her trial testimony, that this MARVIN question only related to actions that occurred during the previous two weeks. (Tr. at 40.)  Thus, the Debtor's MARVIN certifications on this point were accurate because he had not been fired during the two weeks prior to any of the MARVIN certifications.[8]

---

[8]     The Debtor's first MARVIN certification was completed on March 9, 2012, and requested benefits for the weeks ending February 25, 2012 and March 3, 2012.  (Plf. Exh. 4 & 12.)  The

Ms. Frost suggested, however, that the Debtor could have answered "yes" to this question and "that could have been something that could have been used to stop his benefits if he knew that he had given the wrong information" in the original application. (Tr. at 40.)

D. *The Employer's Protests and August 29, 2012 Determination*.

Unlike the Debtor, Harris IT protested the allowance of benefits to the Debtor immediately and multiple times. First, Harris IT filed a protest of the February 2012 Monetary Determination. Harris IT's initial letter to the Agency is dated March 8, 2012, and requests "relief of benefit charges and/or a determination on the claimant's eligibility" based on the fact that "[t]he claimant was discharged for violation of a reasonable and known policy."[9] (Plf. Exh. 10, at 3.) Attached to the protest letter is a narrative description of the details surrounding the Debtor's termination as well as citations to the provisions of the Driver's Handbook that the Debtor was found to have violated. (Plf. Exh. 10, at 4-6.) According to Ms. Frost's affidavit, this initial letter "gave a general description" that Harris IT believed the Debtor should be disqualified from receiving benefits, but "did not provide any supporting documentation." (Plf. Exh. 17, at ¶ 8.)

On May 21, 2012, after receiving a notification of benefit charges to its employer account, Harris IT filed a second protest letter. (Plf. Exh. 10, at 7.) Harris IT filed a third letter on August 23, 2012, again requesting "investigation" of the Debtor's unemployment claim. (Plf. Exh. 10, at 2.)

---

Debtor was fired by Harris IT on February 7, 2012, which was before this two-week period. (Stip. Facts at ¶ 9.)

[9]     The protest letters referenced herein were actually submitted by TALX UC eXpress, as the "duly authorized agent" for Harris IT. (Plf. Exh. 10.) For ease of reference, the letters are referred to herein as correspondence from Harris IT.

After receiving the protest letters from Harris IT, the Agency sent out fact-finding questionnaires to the parties.  (Plf. Exh. 17, at ¶ 9.)  According to Ms. Frost, no additional information or documentation was provided in response to the Agency's inquiries.  (Plf. Exh. 17, at ¶ 9.)  As a result, on August 29, 2012, "the Agency issued a determination based on the information available at that point which found that [the Debtor] had been discharged, but that he was not disqualified from benefits because there was insufficient documentation to establish misconduct."  (Plf. Exh. 17, at ¶ 10; Plf. Exh. 18.)  The Notice of Determination that was sent to the Debtor states the Agency's findings as follows:

> YOU WERE DISCHARGED FROM HARRIS IT SERVICES CORPORATION ON 02/06/2012 FOR BEING ISSUED A RESTRICTED DRIVER'S LICENSE WHICH IS A VIOLATION OF COMPANY POLICY. THE EMPLOYER HAS NOT PROVIDED SUFFICIENT DOCUMENTATION TO ESTABLISH MISCONDUCT.
>
> You are Not Disqualified for benefits under 29(1)(B) of the Michigan Employment Security Act.

(Plf. Exh. 18.)

E. *The Debtor's Emergency Unemployment Compensation Application*.

While the employer's initial protest was pending and prior to the Agency's decision that the Debtor was not disqualified, the Debtor's twenty-six weeks of unemployment benefits were exhausted.  (Tr. at 27.)  As a result, on August 2, 2012, the Debtor filed an Emergency Unemployment Compensation ("EUC") Application with the Agency.  (Plf. Exh. 5.)  In his EUC Application, the Debtor again listed his reason for separation from his prior employer, Harris IT, as "laid off."  (Plf. Exh. 5.)

F. *The Employer's Renewed Protest*.

On September 28, 2012, Harris IT filed a new protest of the Agency's August 29, 2012 determination.  (Plf. Exh. 17, at ¶ 11.)  According to the Frost affidavit, this new

9

protest "provided additional facts and documentation . . . including copies of the policies [the Debtor] violated, [his] signed acknowledgement that he had received those policies, documentation showing he had been convicted of an alcohol-related driving offense and his license had been restricted, and detailing that he had been fired for violating specified policies concerning alcohol use and failing to disclose driving offenses." (Plf. Exh. 17, at ¶ 11, citing Plf. Exhs. 6-10.)

G.   *The June 14, 2013 Redetermination.*

On June 14, 2013, approximately nine months after receiving the renewed protest and supporting documentation from Harris IT, the Agency issued a redetermination finding the Debtor disqualified for benefits. (Plf. Exh. 11.)  The redetermination advises the Debtor of the following "Findings of fact and reason[s]" for his disqualification:

> The employer timely protested the decision issued 8/29/12 which held you not disqualified for benefits.  You were discharged for failing to notify the employer of your restricted license while driving a company leased vehicle which is a violation of company policy.  A review of the file has found that you were aware of the policy and the conditions of your continued employment.  It is found that you were fired for a deliberate disregard of your employer's interest . . . .  Your actions are considered to have been intentional because you failed to disclose a material fact to obtain or increase your benefits.

(Plf. Exh. 11.)  The redetermination states that the Debtor owes the Agency $21,697.00 in restitution[10] and $86,788.00 in penalties. (Plf. Exh. 11.)  It also advises the Debtor of his right to protest or appeal the redetermination. (Plf. Exh. 11; Tr. at 31-32.)  According

---

[10]      The List of Overpayments submitted by the Agency shows that $11,923.00 of the total amount of overpayments received by the Debtor (consisting of twenty-five payments of $362, eight payments of $323, and one payment of $289) were made by the UIA after the filing of Harris IT's renewed protest but prior to issuance of the June 14, 2013 redetermination. (Plf. Exh. 12.)

to Ms. Frost, the Agency has no record of receiving a protest or appeal from the Debtor. (Tr. at 32.)

H.  *The Debtor's Bankruptcy Case and the Adversary Proceeding*.

The Debtor filed his chapter 7 bankruptcy case on July 17, 2017, and the Agency commenced this adversary proceeding on October 27, 2017.  The Agency asserts that the total balance owed by the Debtor to the Agency as of the filing date is $113,022.92. (Plf. Exh. 14.)  This amount includes $21,697.00 in restitution, $86,805.00 in penalties,[11] and $8,931.91 in interest, less $4,410.99 in payments received from the Debtor.  (Plf. Exh. 14.)  The adversary complaint seeks a determination that this entire debt is excepted from the Debtor's discharge because it was incurred through fraud under § 523(a)(2)(A).

## III.   DISCUSSION.

Section 523(a)(2)(A) of the Bankruptcy Code provides that any debt "for money, property, services, or an extension, renewal, or refinancing of credit," is nondischargeable "to the extent" it was "obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).  To except a debt from discharge under § 523(a)(2)(A), the creditor must show that:

(1)   the debtor obtained money through a material misrepresentation, that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
(2)   the debtor intended to deceive the creditor;
(3)   the creditor justifiably relied on the false representation; and
(4)   its reliance was the proximate cause of loss.

---

[11]     The penalty amount stated in the complaint exceeds the amount stated in the June 14, 2013, redetermination by $17.00.  A review of the documentation provided by the Agency establishes that the amount stated in the complaint was based on a miscalculation.  The correct amount is four times the $21,697.00 in restitution ordered or $86,788.00.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961 (6th Cir. 1993)).[12] The Agency bears the burden of establishing each of these elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991). Exceptions to discharge are strictly construed against the creditor. *Rembert*, 141 F.3d at 281 (citing *Manufacturer's Hanover Trust v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir. 1988)).

A. *Material Misrepresentation*.

The undisputed facts in this proceeding clearly establish that the Debtor obtained money, in the form of unemployment benefits, from the Agency by knowingly misrepresenting the reason for his separation from his prior employer. The stipulated facts and the Debtor's trial testimony conclusively establish that the Debtor was fired from his employment with Harris IT for violations of their alcohol and vehicle policies. The Debtor knew that he was fired for these reasons. Yet, when he completed his application for unemployment benefits, he indicated "laid off" as his separation reason. This was a misrepresentation that was made knowingly, or at least, with gross recklessness as to its truth. At trial, the Debtor recalled very little about completing his initial application. He testified, however, that he was not particularly confused by the questions and that he proceeded based on his general belief that in he was entitled to unemployment benefits.

---

[12] Although fraud typically involves a deliberate misrepresentation or omission, the United States Supreme Court recently held that "actual fraud" under § 523(a)(2)(A) "encompasses other traditional forms of fraud" even if the fraud is accomplished without a false representation or omission. *Husky Int'l Electronics, Inc. v. Ritz*, __ U.S. __, 136 S. Ct. 1581, 1585 (2016). The Agency has not argued that the Debtor's actions in this adversary proceeding constituted anything other than misrepresentational fraud.

There is likewise no evidence to suggest that the Debtor attempted to correct this misrepresentation.   Instead, the Debtor remained silent even after he received a Handbook from the Agency, which clearly indicated that being fired from prior employment could be the basis for disqualification from receiving benefits.  He also failed to take any action to correct his misrepresentation after Harris IT filed their initial protest stating that he had been fired and arguing that he should be disqualified on that basis. Finally, the Debtor repeated this misrepresentation on his EUC Application in August 2012, again indicating that he was "laid off" from his prior employment with Harris IT.[13]

B. *Intent to Deceive the Agency*.

To establish fraudulent intent, the Agency much prove that the Debtor acted with "an actual intent to mislead, which is more than mere negligence."  *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003) (citation omitted).   A debtor's fraudulent intent may be inferred when the totality of the circumstances surrounding a given transaction "presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor."  *Id.* (citation omitted).

The totality of circumstances in this proceeding lead to the inescapable conclusion that the Debtor misrepresented his separation reason with the intent to mislead the Agency.  The Debtor knew he was fired from his job with Harris IT, but selected "laid off" as the separation reason on his initial application for unemployment benefits.  He offered no plausible explanation for this choice.  He allowed the misrepresentation to continue

---

[13]    The court finds that the statements in the Debtor's bi-weekly MARVIN certifications were not material misrepresentations.  The MARVIN question asked the Debtor to disclose whether he had quit any work, failed to accept a job, or had been fired from a job, but was limited to the two-week period for which Debtor was claiming benefits.  The Debtor was not fired in the two weeks preceding any of his MARVIN certifications.

throughout the time that he received benefits, even in the face of protests by his former employer. He repeated the misrepresentation in his EUC Application. The Debtor's actions paint a picture of deceptive conduct that were clearly intended to deceive the Agency.

C. *Justifiable Reliance*.

The most difficult question in this proceeding is whether, and to what extent, the Agency justifiably relied on the Debtor's misrepresentation. The Supreme Court has held that excepting a debt from discharge under § 523(a)(2)(A) requires the creditor to establish that its reliance was "justifiable," which is a lower standard than "reasonable" reliance. *Field v. Mans*, 516 U.S. 59, 74-75, 116 S. Ct. 437, 446 (1995). An entity may be "justified in relying on a representation of fact 'although [it] might have ascertained the falsity of the representation had [it] made an investigation.'" *Field v. Mans*, 516 U.S. at 71, 116 S. Ct. at 444 (citing *Restatement (Second) of Torts* § 540 (1976)). Unlike reasonable reliance, which requires a plaintiff's conduct to conform to the standard of the objectively reasonable person, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of application of a community standard of conduct to all cases." *Id.* (citing *Restatement (Second) of Torts* § 545A, cmt. b).

The Supreme Court noted, however, that "[j]ustifiability is not without some limits." *Id.* The recipient of a fraudulent misrepresentation is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or

14

investigation." *Id.* (citing *Restatement (Second) of Torts* § 541, cmt. a).   Quoting an

example from the *Restatement*, the Court explained:

> [I]f one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, [this rule] applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses.  Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.

*Id.* (citing *Restatement (Second) of Torts* § 541, cmt. a).

In this case, the relationship between the Agency and the Debtor is unquestionably

unique and complex.  The UIA is an agency of the State of Michigan, established by the

Michigan Employment Security Act (the "MES Act") to administer the unemployment

insurance program.  *See* Mich. Comp. Laws. § 421.1 *et seq.*  The purpose of the MES

Act is to "lighten the burden of economic insecurity on those who become unemployed

through no fault of their own."  *Empire Iron Mining P'ship v. Orhanen*, 565 N.W.2d 844,

848 (Mich. 1997) (citation omitted).  Fulfilling this purpose requires the UIA to implement

procedures which ensure that claims are processed in a timely manner so that claimants

receive the assistance they need when they most need it. *See State of Kansas v. Oliver*

*(In re Oliver)*, 554 B.R. 493, 501-02 (Bankr. D. Kan. 2016) (discussing the Kansas

unemployment statute and noting that "prompt receipt of unemployment compensation

can mean the difference between having food on the table and going without for many

families").

Claimants also play an important role in effectuating the purposes of state

unemployment programs.   Under the MES Act and Agency policy, unemployment

claimants are required to make certain disclosures to the UIA prior to receiving benefits.

15

The process involves two steps.   First, claimants must make initial representations regarding their overall eligibility to receive benefits, including the reason for their termination from their past employment.  After a claimant is deemed eligible, the claimant must make additional representations about his or her continuing eligibility to be paid benefits by calling or logging in to the MARVIN system every two weeks.

Recognizing the importance of truthful claimant representations in achieving the purposes of state unemployment programs, the majority of courts that have considered the issue have held that it is justifiable for state agencies to rely on representations made in a claimant's initial application and his or her weekly certifications when determining the claimant's eligibility for benefits.  *See Ohio Dept. of Job & Family Servs. v. Yuppa (In re Yuppa)*, 2013 WL 4854479, *4 (Bankr. S.D. Ohio June 12, 2013) (unpublished opinion); *see also In re Oliver*, 554 B.R. at 501-02 (reliance on debtor's weekly wage certifications was justified when more detailed investigation would cause delay and frustrate purpose of state unemployment act and when debtor is in best position to know wage information and report it truthfully); *New Mexico Dept. of Workforce Solutions v. Bell (In re Bell)*, 2014 WL 6819714, *4 (Bankr. D.N.M. Dec. 2, 2014) (unpublished opinion) (reliance on debtor's misrepresentations was justified when state department had no reason to doubt their veracity until it later conducted an audit that revealed the discrepancies).  In short, most state unemployment programs rely heavily "on the honest claimant to carry out the intent of the legislature," which is to provide benefits to unemployed workers and their families in a timely and efficient manner, and it is generally justifiable for them to do so.  *State of Colorado ex rel. Central Collection Serv. v. O'Brien (In re O'Brien)*, 110 B.R. 27, 32-33

(Bankr. D. Colo. 1990) (holding, in a decision pre-dating *Field v. Mans*, that the state unemployment agency satisfied a reasonable reliance standard).

This court agrees that the UIA was initially justified in relying upon the Debtor's misrepresentation about his termination from his prior employment in determining his eligibility for benefits.  The UIA's initial determination that the Debtor was eligible for benefits was dated February 24, 2012, and was unquestionably based on the representation made by the Debtor in his application.  At that time, the Debtor was in the best position to know and disclose the reason for his separation from his job with Harris IT.  The UIA had no reason to doubt the truth of the Debtor's representation that he was "laid off" and no independent obligation to investigate.

The more challenging question in this adversary proceeding is whether, and for how long, the Agency's reliance on the Debtor's representation continued to be justifiable, give the numerous and almost immediate protests filed by the employer, the Agency's subsequent investigation, and its ultimate receipt of documentation clearly establishing that the Debtor was terminated from his prior employment for misconduct.  In support of its assertion that its reliance on the Debtor's stated separation reason was justifiable even after these additional events, the UIA cites another unique feature of its relationship with unemployment claimants.  Specifically, the Agency argues that after an applicant is deemed eligible for benefits and the claim is put into pay status, the UIA is not permitted to terminate benefits on the claim based solely on an employer's protest.  The UIA asserts that this practice is mandated by the United States Supreme Court's decision in *California Dept. of Human Resources Dev. v. Java*, 402 U.S. 121, 91 S. Ct. 1347 (1971).

The issue before the Court in *Java* was whether a provision of the California Unemployment Insurance Code that automatically suspended benefit payments upon the filing of an appeal of an initial eligibility determination violated the federal Social Security Act.  Under the Social Security Act, state unemployment programs are not permitted to receive federal funding unless they meet all of the federal requirements.  One such requirement is that "state methods of administration be found 'to be reasonably calculated to insure full payment of unemployment compensation when due.'"  *Java*, 402 U.S. at 125 & n.2 (citing § 303(a)(1) of the Social Security Act, 42 U.S.C. § 503(a)(1)).  The Court held that for purposes of the Social Security Act, the term "when due" meant "at the earliest stage of unemployment that such payments [are] administratively feasible after giving both the worker and the employer an opportunity to heard."  *Java*, 402 U.S. at 131. The Court concluded that the California provision, which suspended benefit payments for a median of seven weeks pending eligibility appeals, was not consistent with this definition and that enforcement of the state statute should be enjoined.  *Java*, 402 U.S. at 133-35.  To comply with *Java*, the UIA argues that once an applicant has been deemed eligible, Agency policy only permits termination of benefits "after a redetermination has been issued finding the claimant disqualified or ineligible for benefits."[14]  Plf. Exh. 17 at ¶ 14-15 (citing Plf. Exh. 19).

---

[14]    Although it was not cited by the Agency, it appears that this policy is mandated by the MES Act itself, which now provides that:

> When a determination, redetermination, or decision is made that benefits are due an unemployed individual, the benefits become payable from the fund and continue to be payable to the unemployed individual, subject to the limitations imposed by the individual's monetary entitlement, if the individual continues to be unemployed and to file claims for benefits, until the determination, redetermination, or decision is reversed, a determination, redetermination, or decision on a new issue holding the individual disqualified or ineligible is made, or, for benefit years

The court credits the Agency's explanation of the *Java* decision and the policy that have been put in place to ensure compliance with its provisions.  Under *Java* and the MES Act, the UIA was not permitted to suspend further payments to the Debtor immediately upon its receipt of the employer's protest letters, the first of which was dated March 8, 2012, just weeks after the initial eligibility determination.  This is true even though the letters included detailed narrative information describing the Debtor's termination from his employment which, under different circumstances, might have rendered continued reliance by another creditor unjustifiable.  Instead, the UIA was required to continue paying the Debtor pending its investigation of the employer's allegations.  The Agency did just that.  Upon completion of its investigation, the Agency issued a Notice of Redetermination on August 29, 2012.  The Redetermination stated that the Debtor "was discharged from Harris IT" in February 2012 "for being issued a restricted driver's license which is a violation of company policy" but indicated that Harris IT had "not provided sufficient documentation to establish misconduct."  Accordingly, the UIA determined that the Debtor was not disqualified for benefits as of the date of the Redetermination.  Absent adequate proof of Harris IT's contention that the Debtor was fired for violating company policy, the Agency was justified in continuing to rely on the Debtor's representation regarding his separation reason through this point.

However, as noted above, justifiability is not without limits.  In response to the August 2012 Redetermination, Harris IT filed another letter of protest on September 28,

---

beginning before October 1, 2000, a new separation issue arises resulting from subsequent work.

Mich. Comp. Laws § 421.27(a)(1); *see generally General Motors Corp. v. Michigan Employment Security Comm'n*, 266 N.W.2d 470, 472-73 (Mich. App. 1978) (identifying this subsection as one of the additions made to the MES Act after *Java*).

2012.  This time, Harris IT attached a copy of the Order of Action from the Michigan Department of State, which indicated that the Debtor had been convicted of operating a vehicle while impaired by liquor and had his license restricted, a Background Investigation Report showing his conviction and restricted license, a copy of the relevant portions of the Harris IT Driver's Handbook, and a document signed by the Debtor acknowledging his receipt of the Driver's Handbook.  Once Harris IT provided this documentation to the UIA, it had satisfied all of the Agency's concerns about the reasons for the Debtor's separation from his employment.  At this point, to use the *Restatement* illustration, even an unexperienced horseman could have discerned that the horse only had one eye.

Although the Agency was in possession of evidence that clearly established that the Debtor was fired by Harris IT for misconduct and that his prior representations suggesting otherwise were patently false as of September 28, 2012, the UIA continued to pay benefits to the Debtor for almost nine months.  It was not until June 14, 2013, that the Agency finally issued a redetermination finding that the Debtor was never eligible for benefits.  Again, the court recognizes that the unique obligations imposed on the Agency under *Java* and the MES Act may have rendered the Agency unable to immediately suspend payments to the Debtor upon its receipt of documentation from the employer. *See, e.g., New Mexico Dept. of Workforce Solutions v. Beebe (In re Beebe)*, 2016 WL 4945454, *7 (Bankr. D.N.M. Sept. 14, 2016) (unpublished opinion) (holding that state unemployment department's delay in "ferreting out" the debtor's fraud was justifiable when the department implemented its procedures "with the promptness of which it was capable at [the] time" but suggesting that unjustifiable delay by a governmental body could be possible under different facts).

20

However, for purposes of its fraud claim, it is the Agency's burden to show that its reliance on the Debtor's misrepresentations continued to be justified even after the representations were proven to be false. The Agency has not met that burden in this case. Other than its citation to *Java*, the UIA only offered two pieces of evidence that could possibly be construed as justifying the length of the Agency's investigation after its receipt of the employer's documentation and its continued reliance throughout that time. First, Ms. Frost provided general testimony regarding the high volume of claims and long processing times at the Agency during the relevant time period. Second, she testified that, at the time relevant to the Debtor's claims, the MES Act provided a six-year period for the Agency to make a redetermination in a fraud case. Neither of these assertions relates specifically to the UIA's investigation of the Debtor's unemployment claim and neither establishes why, in this case, the Agency was justified in continuing to rely on the Debtor's misrepresentations for almost nine months after they were proven to be false. The Agency's reliance on *Java*, without facts in evidence to support the rationale for taking nearly nine months to make a redetermination as to the Debtor's claim, does not equate to justifiable reliance on the Debtor's misrepresentations. Absent additional proof, the court can only conclude that the UIA's reliance was not justified after September 28, 2012.

Of the $21,697 in total overpayments made to the Debtor, $9,774 constituted payments for the weeks through and including September 29, 2012.[15] The court concludes that the Agency was justified in relying on the Debtor's misrepresentations when it made these payments. The balance of $11,923 derived from payments made by

---

[15]    Although the letter from Harris IT was dated September 28, 2012, the relevant benefit week ended on September 29, 2012. *See* Plf. Exh. 12. For simplicity, the court has used September 29, 2012, as the operative date in its calculation of damages.

21

the UIA to the Debtor after September 29, 2012 – the point at which the Agency had unequivocal evidence showing that the Debtor had been fired form Harris IT for misconduct.  The Agency has not met its burden of establishing that it was justified in relying on the Debtor's misrepresentations in making these overpayments.

D.  *Reliance as the Proximate Cause of the Loss*.

To satisfy the proximate causation element of the *Rembert* test, the Agency must establish that "the [D]ebtor's conduct has been so significant and important a cause" of the Agency's losses, "that the [D]ebtor should be legally responsible."  *WebMD Practice Servs., Inc. v. Sedlacek (In re Sedlacek)*, 327 B.R. 872, 888 (Bankr. E.D. Tenn. 2005) (citation omitted).  "There must be a direct link between the alleged fraud and the creation of the debt."  *Id.* (citations omitted).

There is no question that the Agency's justifiable reliance on the Debtor's misrepresentations in making the $9,774 in benefit payments through the end of September 2012, was the proximate cause of its resulting loss.  The causation element has been met.

E.  *Summary*.

In summary, the court finds that the Debtor misrepresented the reason for his separation for his prior employment when he indicated, both in his initial application and his EUC Application, that he was "laid off" rather than fired for misconduct.  The Debtor knowingly or recklessly made these misrepresentations with the intent to deceive the Agency.  The Agency justifiably relied on these misrepresentations until September 28, 2012, when it was provided with documentation clearly demonstrating their falsity.  After September 28, 2012, the falsity of the Debtor's statements should have been evident to

22

the Agency, and its reliance on the Debtor's misrepresentations was no longer justified. The UIA's justifiable reliance caused it to make $9,774 in payments to the Debtor which he was not entitled to receive. The debt for these overpayments is nondischargeable under § 523(a)(2)(A). The debts for the portions of the penalties and interest attributable to these overpayments, in the amounts of $39,096.00 and $4,019.36 respectively, also resulted from the Debtor's fraud and are nondischargeable under § 523(a)(2)(A) and *Cohen v. de la Cruz*, 523 U.S. 213, 118 S. Ct. 1212 (1998).[16]  *See Kozlowski v. Michigan Unemployment Insurance Agency*, 218 F. Supp.3d 553, 557 (E.D. Mich. 2016) (holding, in a chapter 13 case, that statutory penalties for fraud may be nondischargeable under § 523(a)(2) and *Cohen*).

F.   *Preclusive Effect of Prior Administrative Redetermination*.

To the extent the evidence presented at trial was not sufficient to establish the nondischargeability of the debt under § 523(a)(2)(A), the Agency asserts that its prior Administrative Determination establishes the fraudulent nature of the Defendant's actions under the doctrines of collateral estoppel and/or res judicata. This court has previously held that a similar redetermination issued by the Agency was not "adjudicatory in nature" and was not entitled to collateral estoppel effect in nondischargeable debt adversary proceedings. *Michigan Unemployment Insurance Agency v. Green (In re Green)*, 556

---

[16]   The $9,774 in overpayments that are attributable to the Debtor's fraud represent approximately 45% of the total overpayments made by the UIA to the Debtor. The court has calculated the nondischargeable penalties by multiplying the overpayment amount by four and has designated 45% of the $8,931.91 in total interest assessed as nondischargeable interest.

The Debtor also previously repaid the UIA a total of $4,410.99. Neither party offered any evidence as to how these payments were applied. *See* Plf. Exh. 14, at 2 (showing payments deducted from total amount owed). Absent such evidence, Michigan law presumes that payments are applied such that "the oldest debts are paid first." *Corradini v. Corradini (In re Corradini)*, 276 B.R. 571, 576 (Bankr. W.D. Mich. 2002). Therefore, the court will deduct the $4,410.99 the Debtor previously repaid to the Agency from the nondischargeable portion of the debt.

B.R. 853 (Bankr. W.D. Mich. 2016).  Persuasive opinions from the U.S. Bankruptcy Court for the Eastern District of Michigan have reached the same conclusion.  *See State of Michigan Dept. of Licensing & Regulatory Affairs, Unemployment Insurance Agency v. Williams (In re Williams)*, 2016 WL 1576285 (Bankr. E.D. Mich. Apr. 15, 2016); *Michigan Unemployment Insurance Agency v. Nemes (In re Nemes)*, Adv. Proc. No. 15-02047 (Bankr. E.D. Mich. Nov. 30, 2015) (unpublished opinion).

In its closing argument, the Agency argued that the present case is distinguishable from *Green* because there is no dispute that the Debtor in this case received notice of the administrative redetermination after it was made and had an opportunity to appeal the findings.  The court's holding in *Green* was not as narrow as the Agency suggests.  In *Green*, the court found no evidence that the procedures used by the UIA in rendering their redeterminations were "quasi-judicial" or "adjudicatory in nature."   To reach this conclusion, the court noted that the only part of the redetermination process that was "even remotely 'adjudicatory in nature' was the right to appeal" but noted that even this factor was in question, given the debtor's testimony that he did not actually receive the redetermination.  *Green*, 556 B.R. at 867.  Even aside from that issue, the court noted that there were several other evidentiary deficiencies that prevented the court from concluding that the redetermination proceedings "possessed any characteristics of being 'quasi-judicial.'" *Green*, 556 B.R. at 867.  Specifically:

> The examiner who conducted the fact-finding was not identified.  There was no hearing.  There are no facts in the record to indicate what the examiner's qualifications were.  There is no evidence as to whether he or she considered the [d]ebtor's responses to the inquiries [sent to the debtor by the Agency], and if so, how he or she might have weighed the evidence.  There is no evidence establishing what standard of proof was used.   The examiner did not testify at the trial in in this court to explain his or her decision-making.

*Id.* The evidence currently before the court provides no greater detail on these points than the record in *Green*. In the absence of such evidence, the Agency's prior administrative redetermination is not entitled to preclusive effect in this adversary proceeding.

## IV.   CONCLUSION.

For the foregoing reasons, this court concludes that the Debtor obtained $9,774.00 in unemployment overpayments through fraudulent misrepresentations on which the UIA justifiably relied to its detriment. The resulting debt for $9,774.00 in restitution, plus $39,096.00 in statutory penalties and $4,019.36 in interest, less $4,410.99 already paid by the Debtor to the Agency, is nondischargeable under § 523(a)(2)(A). A separate judgment excepting $48,478.37 of the total debt owed by the Debtor to the UIA from the Debtor's discharge under § 523(a)(2)(A) shall be entered.

**IT IS SO ORDERED.**

**Dated March 27, 2019**





James W. Boyd
United States Bankruptcy Judge